UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| STOCKDALE INVESTMENT GROUP INC. D/B/A STOCKDALE, § § § | | |
| Plaintiff, § | | |
| VS. § | CIVIL ACTION NO. 4:18-cv-2949 | |
| § | | |
| STOCKDALE CAPITAL PARTNERS, LLC, § *et al*, § | | |
| Defendants. | | |

**MEMORANDUM AND ORDER**

This is a trademark infringement and unfair competition dispute between Plaintiff Stockdale Investment Group d/b/a Stockdale ("Plaintiff") and Defendants, Stockdale Capital Partners, LLC and its affiliated companies (collectively "Defendants"), over the use of "Stockdale." Before the Court is Defendants' Motion for Summary Judgment. (Doc. No. 34). After considering the parties' filings, all responses and replies thereto, oral argument, and the applicable law, the Court finds that Defendants' Motion for Summary Judgment must be **DENIED**.

**I. BACKGROUND**

Plaintiff is a real estate services company operating in Texas, California, and North Carolina. (Doc. No. 53 at ¶15). It focuses on the "real estate design, construction, and property management space." *Id.* It markets itself as "Stockdale," and has operated continuously under that name since its inception in 1989. *See* (Doc. No. 41-4 at 117), (Doc. No. 53 at ¶15). "Stockdale" was chosen as a reference to Stockdale, California, where the company was founded. (Doc. No. 53 at ¶18). Plaintiff relocated its headquarters to Texas in 2012. It registered the name "Stockdale, LLC" and "Stockdale Capital" with the Texas Secretary of State in 2014 and 2017, respectively. (Doc. No. 53 at ¶16). Plaintiff also attempted to register "Stockdale" as a trademark with the U.S.

1

Patent and Trademark Office (the "USPTO"), but was denied the registration in 2018 on the basis that "Stockdale" is primarily a surname. (Doc. No. 34-8 at 2).

Defendants "are a family of real estate investment, development, and management companies headquartered in Los Angeles." (Doc. No. 34-2 ¶4). Defendants have used the name "Stockdale" continuously since their collective inception in 2013. *Id.* at ¶6. Defendants "are primarily focused on the acquisition and development of real estate for commercial uses" and seek investments from "ultra-high net worth individuals." *Id.* at ¶¶7, 9. Defendants are also "involved in leasing and property management operations, but only as it relates to themselves for their own or their affiliates' properties." *Id.* Defendants "typically target investments, acquisitions, and developments that are in the $50 [million] to $200 [million] range, but up to $400 [million]." *Id.* at ¶8. Defendants claim they were not aware of Plaintiff prior to this claim and they maintain that Plaintiff is not a competitor in the same marketplace. *Id.* at ¶10.

Plaintiff learned of Defendants in 2017 after a broker from a real estate investment firm contacted Plaintiff to inquire whether they were involved in marketing a pending deal. (Doc. No. 41-1 at 112). The name "Stockdale" was on a list of potential buyers. *Id.* Plaintiff was not in fact involved with that deal.

In August 2018, Plaintiff filed suit, alleging claims for relief including trademark infringement under 15 U.S.C. § 1225(a), unfair competition under 15 U.S.C. § 1225(a), and unfair competition under Texas common law.[1] Plaintiff also sought a permanent injunction, which the Court denied in January 2019. Defendants now move for summary judgment. Defendants contend that Plaintiff's mark, "Stockdale," is not protectable because it is merely descriptive as a surname

---

[1] Only three claims for relief remain at issue in this case; Plaintiff withdrew counts II, III, VII, and VIII in its Second Amended Complaint. (Doc. No. 53).

or a geographical descriptor and has not acquired secondary meaning. It further contends that there is no likelihood of confusion between Plaintiff and Defendants' marks.

## II. LEGAL STANDARD

Summary judgment is proper when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if a reasonable jury could enter a verdict for the non-moving party. *Springboards to Educ., Inc. v. Hous. Indep. Sch. Dist.*, 912 F.3d 805, 811 (5th Cir. 2019). The court can consider any evidence in "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The evidence and inferences must be viewed in the light most favorable to the nonmoving party. *Springboards to Educ.*, 912 F.3d at 811.

The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 322-25. Once a movant meets this burden, the burden shifts to the nonmovant to show the existence of a genuine fact issue for trial. *Id.* at 321-25. In a trademark case, "[a]lthough the secondary meaning of a mark and the likelihood of confusion are ordinarily questions of fact, summary judgment may be upheld if the summary judgment record compels the conclusion that the movant is entitled to judgment as a matter of law." *Bd. of Supervisors for La State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.*, 550 F.3d 465, 474 (5th Cir. 2008) (internal citations omitted).

## III. ANALYSIS

To prevail on a trademark infringement claim under the Lanham Act, 15 U.S.C. § 1051 *et seq.*, a plaintiff must show, first, ownership of a legally protectable mark and, second, a likelihood of confusion created by an infringing mark. *All. for Good Gov't v. Coal. for Better Gov't*, 901 F.3d

498, 505 (5th Cir. 2018); *Paulsson Geophysical Servs, Inc. v. Sigmar*, 529 F.3d 303, 309 (5th Cir. 2008).[2] The Court addresses each in turn.

A. LEGALLY PROTECTABLE MARK

A mark is protectable if it is distinctive, meaning it must be "capable of distinguishing the applicant's goods from those of others." *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 237 (5th Cir. 2010) (quoting *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992)). An identifying mark can be distinctive in one of two ways: it can be *inherently* distinctive, or it can *acquire* distinctiveness through "secondary meaning." *Id.* at 237; *see also Wal-Mart Stores, Inc. v. Samara Bros, Inc.*, 529 U.S. 205, 210–11 (2000).

To determine whether a mark is distinctive, marks are often classified into categories of generally increasing distinctiveness: they may be (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, or (5) fanciful. *Two Pesos, Inc.*, 505 U.S. at 768 (citing *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir. 1976)). The latter three categories of marks are deemed inherently distinctive and are entitled to protection because their intrinsic nature serves to identify a particular source of a product. *Id.* By contrast, generic marks "refer to the genus of which the particular product is a species," and thus are never registrable as trademarks. *Id.*

Descriptive marks are not inherently distinctive because they merely "identif[y] a characteristic or quality of an article or service, such as its color, odor, function, dimensions, or ingredients." *Pebble Beach Co. v. Tour 18 1 Ltd.*, 155 F.3d 526, 540 (5th Cir. 1998). A descriptive

---

[2]Although Plaintiff asserts three claims for relief under the Lanham Act and Texas common law, the same legal test applies to all three claims. *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 230 n.7 (5th Cir. 2010) ("A trademark infringement and unfair competition action under Texas common law presents essentially no difference in issues than those under federal trademark infringement actions.") (internal quotation marks omitted).

mark can only be protectible when it has acquired secondary meaning. *Two Pesos*, 505 U.S. at 769. As relevant here, terms that are "primarily merely surnames" or "primarily geographically descriptive" are deemed to be descriptive and thus unprotectable absent a showing of secondary meaning. *See* § 2(e), 15 U.S.C. § 1052(e); *World Carpets, Inc. v. Dick Littrell's New World Carpets*, 438 F.2d 482, 487 (5th Cir. 1971).

1. Type of Mark

Defendants contend that "Stockdale" is at best merely descriptive because it is a surname and because it is geographically descriptive. Plaintiff contends that the mark is arbitrary. The Court finds that Stockdale is at best descriptive as merely a surname, and accordingly does not discuss whether the mark is geographically descriptive.

A mark is primarily merely a surname if the surname "is the primary significance of the mark as a whole to the purchasing public." *Earnhardt v. Kerry Earnhardt, Inc.*, 864 F.3d 1374, 1377 (Fed. Cir. 2017) (quoting *In re Hutchinson Tech., Inc.*, 852 F.2d 552, 554 (Fed. Cir. 1988)). The Trademark Board considers several factors in determining the primary significance of the mark to the purchasing public, including: (1) the rarity of the name, (2) whether it is the name of the applicant, (3) whether there is a significant non-surname meaning, (4) whether the designation has the look and sound of a surname, and (5) whether the context of use contributes to the perception of the designation as a surname. *See* 2 McCarthy on Trademarks and Unfair Competition § 13:30 (5th ed.).

The USPTO denied Plaintiff's application to register "Stockdale" in October 2018 on the basis that it is primarily a surname. The Court agrees. As the USPTO determined, "Stockdale" as a surname is not rare, with 6013 entries in the Lexis database. (Doc. No. 34-8 at 2). Moreover, as the USPTO further determined, the mark has the structure and pronunciation of a surname, there

5

is no stylization associated with the mark that would remove its primary significance from being that of a surname, and the mark has no other known meanings. *Id.* Indeed, "Stockdale" is not defined in the dictionary. *See In re Hutchinson Tech. Inc.*, 852 F.2d at 556 (explaining that lack of dictionary definitions is indicia that the primary significance of a mark is as a surname). Plaintiff contends in response that "Stockdale" is also the name for several cities, neighborhoods, and public schools across the country. (Doc. No. 34-13 at 2). However, such usage is not dispositive of the primary significance of "Stockdale" to the public and, in any event, this evidence does not overcome the USPTO's prima facie case against registration. *See In re Hutchinson Tech. Inc.*, 852 F.2d at 556. Accordingly, Plaintiff's mark is descriptive as a surname.

2. Secondary Meaning

Because Plaintiff's mark is merely descriptive, it is protectable only if it has acquired secondary meaning. A mark develops secondary meaning "when, in the minds of the public, the primary significance of [the mark] is to identify the source of the product rather than the product itself." *Wal-Mart Stores, Inc.*, 529 U.S. at 210–11. To determine whether a mark has acquired secondary meaning, the Fifth Circuit considers the following factors:

> (1) length and manner of use of the mark or trade dress, (2) volume of sales, (3) amount and manner of advertising, (4) nature of the use of the mark or trade dress in newspapers and magazines, (5) consumer-survey evidence, (6) direct consumer testimony, and (7) the defendant's intent in copying the mark."

*Viacom Int'l v. IJR Capital Invs. LLC*, 891 F.3d 178, 190 (5th Cir. 2018) (quoting *Test Masters Educ. Servs., Inc. v. Robin Singh Educ. Servs., Inc.*, 799 F.3d 437, 445 (5th Cir. 2015)).

To support its contention that it has acquired secondary meaning, Plaintiff provides evidence that it has used the "Stockdale" mark continuously for the past thirty years since its

6

inception in 1989. (Doc. No. 41-2 ¶3). Plaintiff claims that the current value of its real estate holdings is in excess of $150 million, and that since 2013 it has expended approximately $75 million in real estate acquisitions. (Doc. No. 41-1 at 42, 97). Although Plaintiff testified that it does not track its advertising expenditures, *id.* at 109, Plaintiff has provided evidence of its various advertising and promotional efforts. For instance, it spent more than $50,000 to acquire the internet domain name, stockdale.com (Doc. No. 41-15 Ex. B-1); it advertises its properties and brand in trade magazines and on websites (Doc. No. 41-1 at 105–07); it pays for membership in industry groups such as the Urban Land Institute (Doc. No. 41-7) and the International Council for Shopping Centers (Doc. No. 41-8); and it has sponsored various events such as the Design Week Dallas, 2018 Thrift Studio, and Light Up Lakewood (Doc. No. 41-9). Finally, Plaintiff was recognized in the Dallas Business Journal as one of the "Best Places to Work" in 2016, 2017, and 2018. (Doc. No. 41-10).

Notably, Plaintiff does not provide empirical evidence connecting Plaintiff's efforts to their efficacy in altering consumer association. However, while empirical evidence such as consumer surveys is the strongest evidence of secondary meaning, it is not required. *See, e.g.*, *Viacom Int'l*, 891 F.3d at 191. Courts in the Fifth Circuit have found secondary meaning even in the absence of empirical evidence. For example, in *Bulbs 4 East Side*, the court determined that there was sufficient evidence to demonstrate secondary meaning where the plaintiff had used the mark continuously for some 34 years, its annual sales had increased over the past eight years to $1.4 million, its advertising expenses had grown during that period, and it enjoyed unsolicited nationwide media coverage. *Bulbs 4 East Side, Inc. v. Ricks*, 199 F. Supp. 3d 1151, 1159 (S.D. Tex. 2016); *see also Smack Apparel Co.*, 550 F.3d 465 (5th Cir. 2008) (affirming a grant of summary judgment on plaintiff's claim of trademark infringement on a record without survey

evidence).³

Given that Plaintiff has undisputedly used the mark for thirty years, has sizeable real estate market value, engages in widespread advertising and promotional efforts, and has received at least some media recognition, Plaintiff has established a genuine fact as to whether its mark has acquired secondary meaning. While a jury may ultimately determine that there is no secondary meaning, whether a mark has acquired secondary meaning is usually a question of fact, and in this case is best reserved for a jury.

### 3. LIKELIHOOD OF CONFUSION

To prevail on its infringement claim, Plaintiff must also show that "the defendant's use of the mark creates a likelihood of confusion in the minds of potential customers as to the source, affiliation, or sponsorship of the product at issue." *Smack Apparel*, 550 F.3d at 478. A likelihood of confusion requires a "*probability* of confusion, which is more than a mere *possibility* of confusion." *Texas Outhouse Inc. v. Fresh Can, LLC*, 266 F. Supp. 3d 928 (S.D. Tex. 2017) (internal citation omitted). "A finding of a likelihood of confusion is a finding of fact." *Id.* at 935.

To determine whether such a likelihood of confusion exists, courts consider a non-exhaustive list of so-called "digits of confusion," including: (1) strength of the mark, (2) mark

---

³Defendants urge that the evidence presented here is more analogous to that in *Amazing Spaces, Inc.*, 608 F.3d at 225. There, the plaintiff, a self-storage services company, sued a competitor for infringing upon its use of a particular star symbol. The Fifth Circuit affirmed that there was no fact issue as to whether the plaintiff's symbol had acquired secondary meaning even though the plaintiff had used the symbol for ten years, spent nearly $725,000 in advertising and promoting the symbol, realized over $11.5 million in revenue since it began using the symbol, and declarations from consumers indicated confusion when seeing rival self-storage facilities that displayed symbols similar to that of the plaintiff. *Id.* at 248. However, *Amazing Spaces* is materially distinguishable. In finding no secondary meaning, the court emphasized that the plaintiff's symbol was not prominently displayed in its advertisements. *Id.* It also pointed to the absence of survey evidence and the fact that the consumer declarations showed that their confusion stemmed from the overall architecture of the facilities, not from the similarity of the plaintiff's and defendant's symbols. *Id.* at 248–49.

similarity, (3) product or service similarity, (4) outlet and purchaser identity, (5) advertising media identity, (6) defendant's intent, (7) actual confusion, and (8) care exercised by potential purchasers. *All. for Good Gov't*, 901 F.3d at 508. In weighing these factors, no one factor is dispositive, and a finding of likelihood of confusion need not be supported by a majority of the factors. *Id.* at 508–09. The Court evaluates each in turn.

<u>Strength of the mark</u>. The strength of a mark is determined by the quality of the mark and, more importantly, by the degree to which it is recognized in the marketplace. *RE/MAX Int'l, Inc. v. Trendsetter Realty, LLC*, 655 F. Supp. 2d 679, 698 (S.D. Tex. 2009). If a mark has acquired secondary meaning, it is deemed to be a strong mark. *Viacom Int'l*, 891 F.3d at 193. Here, as discussed *supra*, "Stockdale" is descriptive and there is a genuine question of fact as to whether it has acquired secondary meaning. This factor is neutral.

<u>Similarity of the marks</u>. Mark similarity "is determined by comparing the marks' appearance, sound, and meaning." *Xtreme Lashes, LLC*, 576 F.3d at 228. Here, the designs of the two marks, taken as a whole, are certainly distinguishable. They feature, for example, different fonts, inverted color schemes, and one includes the additional words "Capital Partners." Nonetheless, even where marks are distinguishable, the inquiry is whether they are "*similar enough* that a reasonable person could believe the two products *have a common origin or association*." *Id.* at 228–29 (emphasis added) (determining that although distinguishable, the "Xtreme Lashes" and "Xtended Beauty" logos were sufficiently similar that consumers could believe that Xtended Beauty was a product line offered by Xtreme Lashes).

In this case, the Court finds that the parties' marks share sufficient similarities that a consumer could conceivably believe that Defendants are associated with Plaintiff. *See Bd. of Regents of the Univ. of Houston Sys. V. Houston Coll. of Law*, 214 F. Supp. 3d 573, 589 (S.D. Tex.

9

2016) (concluding that "Houston College of Law" creates a substantial risk that potential purchasers would believe that it was connected with the University of Houston). Such associational confusion is particularly pertinent where, as here, both parties are real estate companies employing the name "Stockdale" with logos containing similar color schemes. Indeed, Plaintiff's evidence suggests that one individual reached out to Plaintiff's CEO after seeing "Stockdale" on a list of potential buyers of a property he was selling. (Doc. No. 41-16 at 20). He was told that that was a different Stockdale. This factor weighs in favor of a likelihood of confusion.

<u>Similarity of the services and purchaser identity</u>. The parties dispute the extent to which their real estate services overlap. On one hand, Defendants argue that the parties provide different services and operate on different scales. *See, e.g.*, (Doc. No. No. 34-2 ¶¶7, 9). While Defendants' primary service is the acquisition and development of real estate for commercial uses, Plaintiff assists tenants in leasing properties it does not own, acquires real estate without seeking outside investor capital, and provides consultant services to third parties related to site selection and due diligence. *Id.* Plaintiff, on the other hand, avers that the parties acquire the same types of properties, offer property management services, and perform similar business activities. *See, e.g.*, (Doc. No. 41 at 5). The record evidence raises factual questions regarding the extent to which the parties' real estate services overlap. This factor is neutral.

<u>Advertising media identity</u>. Defendants maintain that they do not engage in any advertising, marketing, or sponsorships. This factor weighs against a likelihood of confusion.

<u>Defendant's intent</u>. Plaintiff does not contend that Defendants intended to benefit from Plaintiff's good reputation. However, proof of a defendant's intent is not required to establish

trademark infringement. *Luxottica Grp. S.p.A. v. Atlantic Sunglasses LLC*, 2017 WL 6885602, at *5 (S.D. Tex. Mar. 27, 2017) (quoting *Am Rice*, 518 F.3d at 332)). This factor is also neutral.

Actual confusion. Plaintiff provides only tenuous evidence that consumers have confused Defendants' junior mark for Plaintiff's senior mark. *See Xtreme Lashes*, 576 F.3d at 229. Plaintiff cites to an email and the depositions of individuals who work in the real estate industry and are familiar with Plaintiff to show that people confused Defendants and Plaintiff. In two of these instances, however, while the witnesses did wrongly presume that "Stockdale" referred to Plaintiff, the witnesses did not specifically confuse *Defendants'* mark for Plaintiff's—in other words, Defendants' mark was not the source of confusion. The other two instances provide a somewhat more tenable basis for actual confusion. In one instance, following an article reporting on Stockdale Capital Partners' involvement with the redevelopment of a San Diego shopping mall, Plaintiff's managing partner received an email asking "Is this you guys?!" (Doc. No. 41-15 Exh. A). In another instance, Hunter Brous, a real estate broker, testified that in past discussions with third parties regarding Stockdale Investment Group and Stockdale Capital, "people have been confused about it or asked, is this the group in California?" (Doc. No. 41-17 at 26:12-16).

The Court finds neither the passing email inquiry nor allusions to third parties' confusion to be compelling evidence of actual confusion. However, actual confusion need not be proven to establish a likelihood of confusion; this factor is accordingly neutral.

Care exercised by potential purchasers. Courts have recognized that the more expensive the item or service, the more care a potential purchaser will likely take in its selection. *Xtreme Lashes*, 576 F.3d at 231. Defendants have demonstrated that their real estate investments are a "big ticket" item, *RE/MAX Int'l, Inc.*, 655 F. Supp. 2d at 698, typically ranging between $50 million and $200 million and at times reaching up to $400 million. (Doc. No. 34-2 ¶8). Moreover, both

11

parties acknowledge that potential consumers in the real estate industry exercise a high degree of due diligence in their dealings. *See, e.g.* (Doc. No. 34-5 at 138:15-24). The sophistication and diligence involved in real estate dealings weigh against a likelihood of confusion.

Weighing these factors, the Court is persuaded that, despite the sophistication and diligence of potential real estate customers, a genuine fact issue remains based on the similarity of the marks and the fact that both parties are engaged in the real estate industry. Even sophisticated real estate entities may, at least initially, believe that the two parties are affiliated with one another, which could cause reputational harm. Moreover, as occurred on at least one occasion discussed above, real estate brokers evaluating bids, upon seeing "Stockdale," may initially confuse one Stockdale for the other, thereby causing one party to lose out on a transaction. Where the likelihood-of-confusion analysis is closely balanced, the question should be resolved in favor of the senior user. *See SA Bay LLC v. Hall*, 849 F. Supp. 2d 761, 722 (S.D. Tex. 2012) (quoting *Am. Century*, 295 Fed. Appx. at 638). As with secondary meaning, the question of likelihood of confusion is a heavily fact-bound inquiry that, in this case, is best reserved for a jury.

## IV. CONCLUSION

For the foregoing reasons, the Court **DENIES** Defendants' Motion for Summary Judgment.

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas, on this the 15th of October, 2019.

HON. KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE